IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA )
)
v. ) Criminal No. 3:07CR247–HEH
)
LARRY DONNELL FRYE, )
)
    Petitioner. )

## MEMORANDUM OPINION
(Denying 28 U.S.C. § 2255 Motion)

Larry Donnell Frye, a federal inmate proceeding *pro se*, filed this motion under 28 U.S.C. § 2255 ("§ 2255 Motion" (ECF No. 87)) to vacate, set aside, or correct his sentence. In his § 2255 Motion, Frye raises the following grounds for relief:

> (1). Trial counsel's ineffective assistance of counsel at pretrial stage by failing to file motion to dismiss Indictment.
> (2). Trial counsel's ineffective assistance of counsel at the pretrial stage by failing to interview or investigate government witnesses.
> (3). The [sic] counsel's ineffective assistance of counsel by failure to use impeachment evidence to impeach government witnesses.
> (4). The [sic] counsel's ineffective assistance of counsel by failing to interview or investigate defense witnesses to develop a theory of defense.
> (5). Counsel unprofessionally failed to investigate [and] present available evidence material to the sentencing of Mr. Frye. Counsel also unprofessionally failed to object to false and unreliable evidence used to determine Mr. Frye's guideline sentencing range and ultimate sentence.
> (6). Trial/Appeal counsel's failure to investigate a defense of innocence or discuss such a defense with Mr. Frye prior to his pretrial, trial, sentencing and direct appeal process.
> (7). Mr. Frye counsel's [provided] ineffective assistance of counsel by failing to file Mr. Frye['s] Discovery in evidence file about government main cooperating witness prior to trial process.

(Mem. Supp. § 2255 Mot. 7 (emphasis omitted) (spelling corrected).)

Thereafter, Frye filed a Motion to Supplement his § 2255 Motion ("Motion to Supplement" (ECF No. 90)) and a Motion to Amend his § 2255 Motion ("Motion to Amend" (ECF No. 98)) wherein he provides additional arguments with respect to the claims raised in his § 2255 Motion. Frye's motions (ECF Nos. 90, 98) will be granted.

The Government has responded. Frye has replied. The § 2255 Motion is ripe for disposition.

## I. Procedural History

A grand jury charged Frye with one count of armed bank robbery. (Indictment 1.) The evidence at trial reflected that on February 21, 2006, at approximately 10:55:22 a.m., a masked, armed man entered and robbed the Wachovia Bank ("the Bank") at 3201 West Cary Street in Richmond, Virginia. (Feb. 27, 2008 Tr. 4–5, 12–13, 18.) The robber fled from the Bank, on foot, at 10:56:00 a.m. (Feb. 27, 2008 Tr. 20.)

Michael Pace testified that on the morning of February 21, 2006, he was walking on Auburn Street, across from the Bank, when he heard a pop and then saw a cloud of red smoke surround a man. (*See* Feb. 27, 2008 Tr. 46–48.) Pace observed "a black man engulfed in this cloud of red smoke. He was flailing around throwing money out of his shirt onto the ground as if he was being burned . . . ." (Feb. 27, 2008 Tr. 50.) Thereafter, the man took off running. (Feb. 27, 2008 Tr. 50.) Pace called the police and stood over the money until the police arrived. (Feb. 27, 2008 Tr. 51.)

Officer Walter C. Stone was on patrol in the vicinity of the Bank when he heard of the robbery on his police radio. (Feb. 27, 2008 Tr. 55–56.) Shortly thereafter, Officer Stone arrived at the parking lot where Pace was standing over the money. (Feb. 27, 2008

2

Tr. 59.) Pace directed Officer Stone to the location where he had seen the robber flee between two houses. (Feb. 27, 2008 Tr. 61.) Officer Stone went to that location and found money and clothing marked with dye. (Feb. 27, 2008 Tr. 62–63.) Officer Stone followed the trail of money blowing out from between the houses to Ellwood Avenue. (Feb. 27, 2008 Tr. 63–64.)

As he emerged on Ellwood Avenue, Officer Stone saw a man sitting in a van. (Feb. 27, 2008 Tr. 64.) Officer Stone asked the man in the van, "*Did you see anyone come through here?*" (Feb. 27, 2008 Tr. 64.) The occupant of the van told Officer Stone that he saw a man with no shirt, on a bike, going east on Ellwood toward the Boulevard. (Feb. 27, 2008 Tr. 65.) The Boulevard was approximately four blocks away. (Feb. 27, 2008 Tr. 65.)

Deputy Sheriff Clarence W. Thompson testified that, on the morning of February 21, 2006, he was serving an eviction notice at Frye's residence, a second-story room in a boarding house at 6 North Boulevard. (Feb. 27, 2008 Tr. 69–70, 72.) Frye's residence was approximately three to four blocks from the Bank. (Feb. 27, 2008 Tr. 70.) Deputy Thompson testified that Frye was not present in the boarding house when the eviction process began. (*See* Feb. 27, 2008 Tr. 71.) The landlord left the building to obtain a lock for Frye's door while Deputy Thompson remained behind. (Feb. 27, 2008 Tr. 71.) At that point, Deputy Thompson heard of the robbery of the Bank over his police radio. (Feb. 27, 2008 Tr. 71–72.) Deputy Thompson went downstairs in the building. (Feb. 27,

3

2008 Tr. 72.) Deputy Thompson then saw Frye[1] come in the back door to the building and hurry upstairs to Frye's room. (Feb. 27, 2008 Tr. 73, 75.) Before Frye barricaded himself in his room, Deputy Thompson said that Frye said that he was going "to get some clothes." (Feb. 27, 2008 Tr. 73.) When Deputy Thompson eventually gained entrance to Frye's room, Frye had fled, apparently out of a window. (Feb. 27, 2008 Tr. 75–76.)

Detective Reuben Albright testified that, on February 21, 2006, he investigated the robbery. (Feb. 27, 2008 Tr. 118.) After reporting to the Bank, Detective Albright went to the location where the robber had discarded clothing worn at the time of the robbery, including a knit hat/skull cap, a shirt, and blue scrubs. (*See* Feb. 27, 2008 Tr. 120–21.) Detective Albright went from that location to Frye's residence. (Feb. 27, 2008 Tr. 122–23.) Detective Albright then met with a K-9 tracking unit and unsuccessfully attempted to locate the robber with the scent from robber's discarded skull cap. (Feb. 27, 2008 Tr. 123–24.)

The police tested the recovered clothing the robber had discarded after the bank robbery, including the knit hat and blue scrub pants. (*See* Feb. 27, 2008 Tr. 120–21, 124–125, 188–89.) DNA testing of that material essentially identified Frye as a contributor of DNA found on the clothing. (*See, e.g.*, Feb. 27, 2008 Tr. 204–06.)

Lamont McCord testified that, after the bank robbery, Frye asked to stay with him. (Feb. 27, 2008 Tr. 149–51.) Frye provided McCord with an account of Frye's participation in the bank robbery, including the exploding dye pack, running into the

---

[1] At trial, Deputy Thompson unequivocally identified Frye as the black man he saw enter the boarding house on February 21, 2006. (Feb. 27, 2008 Tr. 76.)

4

police at his residence, and then fleeing out through the window of his room. (Feb. 27, 2008 Tr. 153–55.)

Against the advice of counsel, Frye testified in his own defense. (Feb. 27, 2008 Tr. 221.) Frye acknowledged entering 6 North Boulevard around the time of the robbery of the Bank. (Feb. 27, 2008 Tr. 245–46.) Frye, however, provided a different, unconvincing account of his interactions with Deputy Thompson. (Feb. 27, 2008 Tr. 245–48.) Frye asserted he fled the residence when Deputy Thompson pulled a gun on him. (Feb. 27, 2008 Tr. 247–48.) Frye also testified that McCord had learned about Frye's case by reviewing a packet of discovery material Frye's counsel had provided to Frye. (Feb. 27, 2008 Tr. 238–40.)

On cross-examination, the prosecutor directed Frye's attention to the four items of clothing the robber had discarded and the police had recovered. (Feb. 27, 2008 Tr. 254.) In response to the prosecutor's questions as to whether he owned the blue scrub pants the police recovered, Frye responded that "they my clothes." (Feb. 27, 2008 Tr. 254.)[2]

On February 28, 2008, a jury convicted Frye of armed bank robbery. (Verdict Form (ECF No. 50) 1.)

At sentencing, the Court granted the Government's Motion for an Upward Variance and sentenced Frye to 250 months of imprisonment. (Sentencing Minutes Entry (ECF No. 63) 1–2.) Frye appealed. The United States Court of Appeals for the Fourth

---

[2] Frye swore that, the week before the robbery, he had thrown away a bunch of clothing. (Feb. 27, 2008 Tr. 254–55.)

5

Circuit affirmed the judgment of this Court. *United States v. Frye*, 325 F. App'x 267, 270 (4th Cir. 2009).

## II. Alleged Ineffective Assistance of Counsel

To demonstrate ineffective assistance of counsel, a convicted defendant must show first, that counsel's representation was deficient and second, that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficient performance prong of Strickland, a convicted defendant must overcome the "'strong presumption' that counsel's strategy and tactics fall 'within the wide range of reasonable professional assistance.'" *Burch v. Corcoran*, 273 F.3d 577, 588 (4th Cir. 2001) (quoting *Strickland*, 466 U.S. at 689). The prejudice component requires a convicted defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In analyzing ineffective assistance of counsel claims, it is not necessary to determine whether counsel performed deficiently if the claim is readily dismissed for lack of prejudice. *Id.* at 697.

### A. Pretrial and Trial Proceedings

#### 1. Failure to Move to Dismiss the Indictment

In Claim 1, Frye faults counsel for failing to move to dismiss the Indictment on the ground that the foreperson failed to sign the Indictment. The sealed copy of the signature

6

page of the Indictment bears the foreperson's signature.[3] Thus, counsel reasonably declined to pursue the meritless challenge urged here by Frye. Accordingly, Claim 1 will be dismissed.[4]

### 2. Failure to Interview and Impeach Government Witnesses

In Claims 2 and 3, Frye faults counsel for failing to interview the Government's witnesses before trial and impeach them during the trial. Specifically, Frye faults counsel for failing to utilize evidence to impeach the testimony of Lamont McCord and Detective Albright. (Mem. Supp. § 2255 Mot. 36–40.) For example, with respect to Detective Albright, Frye insists that Detective Albright testified inconsistently with respect to whether Frye was a suspect on the day of the robbery. (*Id.* at 40–41.) Frye fails to explain how further investigation would have yielded any significant exculpatory or impeachment material beyond Albright's testimony about this issue, an issue that was of little importance to Frye's guilt or innocence. Thus, Frye fails to demonstrate any prejudice as a result of counsel's alleged omissions with respect to Detective Albright.

With respect to Lamont McCord, Frye contends counsel should have impeached Lamont McCord with the evidence of McCord's extensive criminal activities including the fact that McCord "was a hit man that go around killing people for money." (*Id.* at

---

[3] "[P]ursuant to the Judicial Conference of the United States and the E–Government Act of 2002, documents containing identifying information about jurors or potential jurors are not included in the public case file." *United States v. Reed*, 195 F. App'x 815, 819 (10th Cir. 2006).

[4] In his Reply (ECF No. 97), Frye suggests that the Court should recuse itself unless the Court finds in Frye's favor with respect to Claim 1. (Reply 17–18.) Under the pertinent statute, a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Given the frivolous nature of Claim 1, Frye fails to demonstrate any basis for recusal.

39.) On cross-examination, counsel elicited extensive information about McCord's criminal background, including the fact that McCord had killed a man for money. (Feb. 27, 2008 Tr. 169–71.) Thus, Frye fails to demonstrate counsel performed deficiently with respect to his investigation and cross-examination of McCord.

In a related vein, in Claim 7, Frye faults trial counsel for failing "to enter into evidence discovery document . . . as well [as] the Jenck[s] Act Giglio material . . . ." (Mot. to Supplement 1 (capitalization corrected).) Frye wished to introduce this evidence to support his assertion that McCord had learned about Frye's case by reviewing these documents. (Feb. 27, 2008 Tr. 238–40.) Trial counsel explains:

> I did not pursue the issue because I believed if said file had been ruled admissible and the jury members had gotten a chance to view the information contained therein, tremendous damage would have been done to Mr. Frye's interest. The file contained an abundance of prejudicial information, including prior bad acts, prior convictions, uncharged conduct, hearsay, and naked conclusions of which the jury ought not to have been made aware.

(Gov't's Resp. Ex. 1, at 2.) Given these circumstances and Frye's horrible criminal record, counsel acted reasonably in declining to introduce the packet of discovery material Frye alleged McCord had reviewed. Frye fails to demonstrate that counsel's conduct in investigating and cross-examining Government witnesses was constitutionally deficient.

Moreover, given the overwhelming evidence of Frye's guilt, Frye fails to demonstrate any reasonable probability that, but for an omission by counsel with respect to the Government's witnesses or the failure to introduce the documents allegedly reviewed by McCord, Frye might have been acquitted. Shortly after the robbery, Frye

39.) On cross-examination, counsel elicited extensive information about McCord's criminal background, including the fact that McCord had killed a man for money. (Feb. 27, 2008 Tr. 169–71.) Thus, Frye fails to demonstrate counsel performed deficiently with respect to his investigation and cross-examination of McCord.

In a related vein, in Claim 7, Frye faults trial counsel for failing "to enter into evidence discovery document . . . as well [as] the Jenck[s] Act Giglio material . . . ." (Mot. to Supplement 1 (capitalization corrected).) Frye wished to introduce this evidence to support his assertion that McCord had learned about Frye's case by reviewing these documents. (Feb. 27, 2008 Tr. 238–40.) Trial counsel explains:

> I did not pursue the issue because I believed if said file had been ruled admissible and the jury members had gotten a chance to view the information contained therein, tremendous damage would have been done to Mr. Frye's interest. The file contained an abundance of prejudicial information, including prior bad acts, prior convictions, uncharged conduct, hearsay, and naked conclusions of which the jury ought not to have been made aware.

(Gov't's Resp. Ex. 1, at 2.) Given these circumstances and Frye's horrible criminal record, counsel acted reasonably in declining to introduce the packet of discovery material Frye alleged McCord had reviewed. Frye fails to demonstrate that counsel's conduct in investigating and cross-examining Government witnesses was constitutionally deficient.

Moreover, given the overwhelming evidence of Frye's guilt, Frye fails to demonstrate any reasonable probability that, but for an omission by counsel with respect to the Government's witnesses or the failure to introduce the documents allegedly reviewed by McCord, Frye might have been acquitted. Shortly after the robbery, Frye

was found in the immediate vicinity of the robbery. The police recovered the clothing worn by the robber. DNA evidence and Frye's own testimony reflected that the recovered clothing belonged to Frye.

Frye's testimony and his theory of his innocence strain credulity. Frye suggested the true robber had taken Frye's discarded clothes from the trash the week before the robbery. (Feb. 27, 2008 Tr. 244–45.) According to Frye's theory, the robber would have then placed Frye's discarded clothes on his person, robbed the bank, discarded the dye-covered clothes, and fled directly towards Frye's residence.

Frye's theory of innocence would have required another remarkable coincidence: moments after the robber discarded the dye-stained clothing, Frye entered his residence, and according to Deputy Thompson, hurried upstairs into his room to get clothes, and then fled out of the second-story window. (Feb. 27, 2008 Tr. 73–76.) Given this damning evidence, Frye fails to demonstrate any reasonable probability of prejudice flowing from counsel's acts or omissions. As here, "sometimes it is the nature of the evidence, rather than the acts [or omissions] of the lawyer, that 'prejudice' the defendant." *Meyer v. Branker*, 506 F.3d 358, 370 (4th Cir. 2007). Accordingly, Claims 2, 3, and 7 will be dismissed because Frye fails to demonstrate deficiency or prejudice.

### 3. Failure to Interview or Investigate Witness, Call a Defense Witness, and Produce an Adequate Defense

In Claims 4 and 6, Frye faults counsel for failing to interview or investigate a witness, call a witness for the defense, and present an adequate defense. To prevail on such claims, Frye must identify what an adequate investigation would have revealed.

9

*See Beaver v. Thompson*, 93 F.3d 1186, 1195 (4th Cir. 1996) ("[A]n allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced." (citing *Bassette v. Thompson*, 915 F.2d 932, 940–41 (4th Cir. 1990))). Here, Frye suggests that counsel should have called Steven Stanley, an inmate with Frye and McCord at the Warsaw Regional Jail. (Mem. Supp. § 2255 Mot. 47–48.) Had counsel called Stanley, Stanley would have corroborated Frye's testimony that Frye discovered McCord reading Frye's discovery material. (*Id.* Ex. H 2.) Additionally, Stanley swears, "I was approached by **Lamont E. McCord,** he ask me did I have anybody that he could testify against for the government to get a deal . . . for a [lighter] sentence, because the govern[ment] **HAD** enough evidence to convict **Him** of first degree murder, which **He** could get the death sentence." (*Id.* at 1.) Such evidence would have done little to undermine the Government's compelling circumstantial case against Frye, which did not hinge on the credibility of McCord.

As part of his claim that counsel failed to present an adequate defense, Frye faults counsel for failing to elicit evidence from Frye to reflect that Frye's knee and chest problems were inconsistent with the physical activity exhibited by the robber. (Mem. Supp. § 2255 Mot. 52–53.) Counsel reasonably declined to pursue this tactic. Frye's own account of his physical activities around the time of the robbery was hardly that of a physically impaired individual. Frye acknowledged that prior to the robbery he had painted and had worked with sheetrock and that on the day of the robbery he moved easily about his residence and fled through a second-story window. (Feb. 27, 2008 Tr. 244, 247.)

Accordingly, Claims 4 and 6 will be dismissed because Frye fails to demonstrate prejudice.[5]

B.  **Sentencing Proceedings**

In Claim 5, Frye faults counsel for failing "to move for appropriate downward departure" at sentencing based on the changes to the United States Sentencing Guidelines that "went into effect November 1, 2007, [regarding] the definition of 'Related Case' to be used in USSG 4A1.2(A)." (Mem. Supp. § 2255 Mot. 43.) The Court employed the March 3, 2008 version of the United States Sentencing Guidelines Manual at sentencing, which incorporated any amendment effective November 1, 2007. (Presentence Investigation Report ¶ 168; *id.* Worksheet A 1.) Thus, Frye's suggestion that the Court failed to employ recent amendments to the Sentencing Guidelines lacks factual merit.

Moreover, no conceivable basis existed for a downward departure. Frye had in excess of fifty adult convictions. (Presentence Investigation Report ¶¶ 23–64.) As the Court noted before granting the Government's Motion for an Upward Variance, Frye's record was "among the worst I've seen in a long time." (June 18, 2008 Tr. 14.) Accordingly, Claim 5 will be dismissed because Frye fails to demonstrate deficiency or prejudice.

---

[5] Frye also generally complains about the conduct of appellate counsel and that counsel failed "to object to false and unreliable evidence" at sentencing. (Mem. Supp. § 2255 Mot. Ex. D ¶ F.) Frye, however, fails to identify the allegedly false and unreliable evidence or any issue that counsel should have raised that might have resulted in a favorable result on appeal. Allegations of this ilk provide no basis for § 2255 relief and will not be considered further. *See Sanders v. United States*, 373 U.S. 1, 19 (1963) (finding summary denial of § 2255 motion appropriate where petitioner "stated only bald legal conclusions with no supporting factual allegations").

The § 2255 Motion (ECF No. 87) will be denied. The action will be dismissed. A certificate of appealability will be denied.[6] Frye's Motion for an Evidentiary Hearing (ECF No. 100) will be denied.

An appropriate Final Order will follow.

/s/
HENRY E. HUDSON
UNITED STATES DISTRICT JUDGE

Date: July 16, 2013
Richmond, Virginia

---

[6] An appeal may not be taken from the final order in a § 2255 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(B). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Frye has not satisfied this standard.